UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| SAS INTERNATIONAL, LTD., <br><br> Plaintiff, <br><br> vs. <br><br> GENERAL STAR INDEMNITY COMPANY, <br><br> Defendant. | C.A. No. 1:20-cv-11864 <br><br> PLAINTIFF DEMANDS TRIAL BY JURY |

## FIRST AMENDED COMPLAINT

Plaintiff, SAS International, Ltd. ("SAS"), brings this action against defendant, General Star Indemnity Company ("General Star"), and alleges as follows:

### NATURE OF THE CASE

1. This action seeks a declaratory judgment, pursuant to 28 U.S.C. § 2201 to construe and declare the rights, duties, status and legal relations of the parties as the named insureds and insurer under a commercial property insurance policy issued by General Star to SAS, Policy No. IMA346757A (the "Policy").

2. The presence of SARS-CoV-2, the COVID-19 pandemic, and resulting civil authority orders caused physical loss of or damage to SAS's properties. SAS has sustained business interruption losses and incurred extra expenses because of these causes of loss, so SAS submitted a claim for these losses to General Star.

3. The Policy unambiguously provides coverage for SAS's losses, and no exclusion applies to exclude coverage.

4. However, even if another reading of the Policy could reasonably result in a finding of no coverage, the existence of two reasonable readings of the Policy – one finding coverage, and the other not – would mean the Policy is at worst, ambiguous. Any such ambiguity should be interpreted in favor of coverage.

5. Nonetheless, General Star failed to hold up its end of the bargain by denying all coverage for SAS's claim.

6. As described herein, this action seeks a declaratory judgment that affirms that the presence of SARS-CoV-2, the COVID-19 pandemic, and resulting civil authority orders issued to stop the spread of the outbreak trigger coverage under the Policy, have caused physical loss of or damage to covered property, provide coverage for civil authority orders resulting in the suspension or curtailment of SAS's business operations, and finds that General Star is liable for the losses suffered by SAS up to the limits of the Policy. Additionally, this action seeks damages for General Star's breach of its contractual obligation under the all-risk Policy to indemnify SAS for business losses and extra expenses, and related losses resulting from COVID-19 and the actions taken by governmental authorities to prevent the spread of the COVID-19 outbreak.

## PARTIES

7. SAS is a Massachusetts corporation with a principal place of business in Fall River, Massachusetts.

8. On information and belief, General Star is a Delaware corporation with a principal place of business at 120 Long Ridge Road, Stamford CT 06902-1843. General Star solely (100%) underwrote, subscribed, issued and delivered the Policy to SAS, protecting SAS from all risks unless specifically excluded with effective dates from September 16, 2019 through September 16, 2020.

9. At all relevant times, General Star has done business in the Commonwealth of Massachusetts.

## JURISDICTION AND VENUE

10. This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 2201 since, according to General Star's removal notice, the parties are completely diverse in citizenship and the amount in controversy exceeds $75,000, exclusive of interests and costs.

11. Venue is proper in this District under 28 U.S.C. § 1391, because SAS's principal place of business is in this District and a substantial portion of the events and omissions giving rise to the claims and losses occurred within the District.

## STATEMENT OF FACTS

**A.   SAS and The Policy**

12. For many years, SAS has owned and leased commercial property to others in Fall River, Massachusetts.

13. To protect its business in the event of property loss and business interruption, SAS purchased a commercial property insurance policy from General Star.

14. The Policy insures against all risks of loss of or damage to property and ensuing business interruption and extra expense, unless specifically excluded or limited in the Policy.

15. The Policy covers "direct physical loss of or damage to Covered Property…caused by or resulting from any Covered Cause of Loss."

16. The word "or" separates the terms "loss of" and "damage" to signify that the terms should be interpreted in the disjunctive.

17. Coverage may be triggered by "direct physical loss of" property.

18. Coverage may be triggered by "damage" to property.

19.     The Policy defines a "Covered Cause of Loss" as "direct physical loss unless the loss is excluded or limited in this policy." The Policy does not define "physical loss."

20.     The Policy covers "the actual loss of Business Income you sustain due to the necessary 'suspension' of your 'operations' during the 'period of restoration'."

21.     The Policy also covers "Extra Expense (other than the expense to repair or replace property) to: (1) [a]void or minimize the 'suspension' of business… [and] (2)[m]inimize the 'suspension' of business if you cannot continue 'operations'."

22.     The Policy defines "suspension" as "[t]he slowdown or cessation of your business activities;" or "[t]hat a part or all of the described premises is rendered untenantable, if coverage for Business Income Including 'Rental Value' or 'Rental Value' applies."

23.     The Policy defines "operations," in part, as "[y]our business activities occurring at the described premises."

24.     The Policy contains additional coverage for loss of Business Income and Extra Expense caused by action of a civil authority.

25.     The Policy also contains additional coverage for Extended Business Income losses after operations are resumed.

26.     The Policy does not exclude or limit losses caused by viruses, pandemics, or communicable diseases.

**B.      The COVID-19 Pandemic**

27.     During the Policy's term, the novel coronavirus, SARS-CoV-2, commonly referred to as COVID-19, swept the globe.

28.     On March 11, 2020, the World Health Organization (the "WHO") declared the COVID-19 outbreak a pandemic.

29. A pandemic, by definition, is "an epidemic occurring worldwide…"[1] (As used herein the term "Pandemic" means the omnipresence of COVID-19 as a pandemic.)

30. Although SARS-CoV-2 is "novel," scientists now understand that the virus spreads very easily from person to person primarily in three ways.

31. First, COVID-19 spreads during close contact between people who are physically near a person with COVID-19.[2] When people with COVID-19 cough, sneeze, sing, talk, or breathe they produce respiratory droplets. These droplets range in size. Larger droplets fall out of the air due to gravity and attach to surfaces, while smaller droplets and particles carry through the air. Infections occur mainly through exposure to respiratory droplets when a person is in close contact with someone who has COVID-19.

32. Second, these smaller aerosol droplets can linger in the air for hours, infecting people further away from the infected person and even after the infected person has left the premises. This kind of spread is referred to as airborne transmission.[3] Aerosol droplets can be pulled into air circulation systems and spread to other areas in a building.[4]

33. Third, respiratory droplets can also land on surfaces and objects. Surfaces, once physically affected by SARS-CoV-2, are referred to as fomites.[5] There, SARS-CoV-2 can linger

---

[1] Heath Kelly, *The classical definition of a pandemic is not elusive*, 89 Bulletin of the World Health Organization 7, at 540-41 (2011), *available at* https://www.who.int/bulletin/volumes/89/7/11-088815/en/ (last accessed November 4, 2020).

[2] CDC, How COVID-19 Spreads, available at https://www.cdc.gov/coronavirus/2019-ncov/prevent-getting-sick/how-covid-spreads.html (last accessed November 4, 2020).

[3] *Id*.

[4] Ramon Padilla & Javiar Zarracina, WHO agrees with more than 200 medical experts that COVID-19 may spread via the air, USA TODAY (last updated Sep. 21, 2020), available at https://www.usatoday.com/in-depth/news/2020/04/03/coronavirus-protection-how-masks-might-stop-spread-through-coughs/5086553002/ (last accessed November 4, 2020).

[5] Stephanie A. Boone & Charles P. Gerba, Significance of Fomites in the Spread of Respiratory and Enteric Viral Disease, APPLIED & ENVIRON. MICROBIOLOGY (Mar. 13, 2007), available at https://aem.asm.org/content/73/6/1687 (last accessed November 4, 2020).

for up to 28 days,[6] serving as a vehicle for viral transmission during that time span.[7] A person can get COVID-19 by touching a surface or object that has the virus on it and then touching their own mouth, nose, or eyes.[8]

34.     Infected persons "shed" the virus (i.e., pose a risk of viral transmission) before, during, and after their illness.[9] Scientists have reason to believe that infected people are the most contagious before they experience symptoms, during what is called the "incubation" or "pre-symptomatic" period.[10] This period can last up to fourteen (14) days.[11]

35.     In addition, the CDC has estimated that approximately 40% of COVID-19 positive individuals never develop symptoms.[12] This gives the CDC reason to speculate that infection rates for COVID-19 likely are at least ten times higher than reported.[13]

36.     To date, there remains no effective vaccine for COVID-19.

37.     As of November 10, 2020, COVID-19 has infected over 10 million people in the United States and caused more than 237,000 deaths.[14]

---

[6] Shane Riddell, et al., The effect of temperature on persistence of SARS-CoV-2 on common surfaces, VIROLOGY J. (Oct. 7, 2020), available at https://doi.org/10.1186/s12985-020-01418-7 (last accessed November 4, 2020).
[7] Id.
[8] CDC, How COVID-19 Spreads, supra.
[9] Id.
[10] Seungjae Lee, MD, et al., Clinical Course and Molecular Viral Shedding Among Asymptomatic and Symptomatic Patients With SARS-CoV-2 Infection, JAMA (Aug. 6, 2020), available at https://jamanetwork.com/journals/jamainternalmedicine/fullarticle/2769235 (last accessed November 4, 2020); Lirong Zou, M.Sc., et al., SARS-CoV-2 Viral Load in Upper Respiratory Specimens of Infected Patients, 382 NEW ENG. J. MED. 1177 (Mar. 19, 2020), available at https://www.nejm.org/doi/full/10.1056/nejmc2001737 (last accessed November 4, 2020); Monica Ghandi, et al., Asymptomatic Transmission, the Achilles' Heel of Current Strategies to Control Covid-19, 382 NEW ENG. J. MED. 2158 (Apr. 24, 2020), available at https://www.nejm.org/doi/full/10.1056/nejme2009758 (last accessed November 4, 2020).
[11] World Health Organization, Coronavirus disease 2019 (COVID-19) Situation Report – 73 (Apr. 2, 2020), available at https://www.who.int/docs/default-source/coronaviruse/situation-reports/20200402-sitrep-73-covid-19.pdf?sfvrsn=5ae25bc7_2 (last accessed November 4, 2020).
[12] Ellen Cranley, 40% of people infected with COVID-19 are asymptomatic, BUSINESS INSIDER (Jul. 12, 2020), available at https://www.businessinsider.com/cdc-estimate-40-percent-infected-with-covid-19-asymptomatic-2020-7 (last accessed November, 2020).
[13] Id.
[14] CDC, Cases in the U.S. (last updated November 3, 2020), available at https://www.cdc.gov/coronavirus/2019-ncov/cases-updates/cases-in-us.html (last accessed November 11, 2020).

38.     The CDC notes that there is much more to learn about the transmissibility, severity, and other characteristics of COVID-19 and investigations are ongoing.[15]

**C.     The Presence of COVID-19 on SAS's Property**

39.     Individuals infected with and/or suspected to be infected with COVID-19 – asymptomatic, pre-symptomatic, or otherwise – have been present on SAS's insured property, thereby depositing COVID-19 at SAS's insured location.

40.     In addition, given the documented prevalence and known infection rate of COVID-19, it is and remains statistically certain that additional infected individuals have been and, with the regained access to SAS's property, continue to be present at SAS's insured location.[16]

41.     Where individuals with COVID-19 are present, they release respiratory droplets containing SAR-CoV-2.  The droplets then attach to surfaces and hang in the air for days at a time.

42.     This is especially true of SAS's insured property because employees, customers, and mail, parcel and freight delivery drivers are frequently coming and going in and out of SAS's property, increasing the risk of transmission and exposure of SAR-CoV-2 on surfaces and in the air.[17]

43.     SARS-CoV-2 damaged SAS's insured property by attaching to surfaces on and within SAS's insured property and hanging in the air.

---

[15] *See* CDC, *Interim Guidance for Businesses and Employers Responding to Coronavirus Disease 2019 (COVID-19), May 2020, available at* https://www.cdc.gov/coronavirus/2019-ncov/community/guidance-business-response.html (last accessed November 11, 2020).

[16] *See* The Covid-19 Event Risk Assessment Planning Tool, *available at* https://covid19risk.biosci.gatech.edu/  (last accessed November 4, 2020).

[17] *See* CDC, *What Mail and Parcel Delivery Drivers Need to Know about COVID-19* (last updated April 17, 2000), *available at* https://www.cdc.gov/coronavirus/2019-ncov/community/organizations/mail-parcel-drivers.html (last accessed November 11, 2020).

44. SARS-CoV-2 caused the loss of SAS's insured property by rendering it dangerous, unfit, and unsafe for its intended and insured use.

45. Moreover, the Pandemic designation and test positivity rates indicate that SARS-CoV-2 is ubiquitous on surfaces and in the air, causing physical loss and damage to SAS's property.

46. SARS-CoV-2 caused direct physical loss of or damage to SAS's property. Therefore, SARS-CoV-2 – and the Pandemic it caused – are Covered Causes of Loss.

**D.   Civil Authority Orders because of COVID-19, the Pandemic and/or Related Physical Loss of or Damage to Property**

47. In recognition of the danger posed by SARS-CoV-2, the COVID-19 Pandemic, and the physical damage to property that they caused and continue to cause, federal and Massachusetts governments issued "stay-at-home" or "shelter in place" orders (the "Governmental Orders").  The various Governmental Orders prohibit or restrict travel to and from Massachusetts, require certain businesses to close, and instruct residents to remain in their homes unless performing "essential" activities.  A goal of the Governmental Orders is lessening the transmission risk of the deadly disease and slowing the Pandemic's spread.

48. For example, civil authorities in Massachusetts issued orders requiring the suspension of business at various establishments, including SAS's premises.  Specifically:

- On March 23, 2020, while the Policy was in effect, in order to contain the spread of COVID-19, Governor Baker issued an emergency COVID-19 Order No. 13, which designated certain COVID-19 Essential Services, as defined in the Order, temporarily closed the brick-and-mortar premises of businesses and organizations that do not provide "COVID-19 Essential Services"—including SAS—and prohibited gatherings of more than 10 people.  Additionally, Governor Baker directed the Department of Public Health to issue a stay at home advisory outlining self-isolation and social distancing protocols.

- On March 31, 2020, April 28, 2020, and May 15, 2020, Governor Baker issued COVID-19 Orders No. 21, 30, and 32, respectively, which extended the period in which COVID-

>19 Order No. 13 would continue to restrict the operation of businesses and organizations that do not provide COVID-19 Essential Services.

- On May 18, 2020 and June 6, 2020, Governor Baker issued COVID-19 Order Nos. 33 and 37 respectively, which authorized the re-opening of certain brick-and-mortar premises designated as "Phase I" and "Phase II" enterprises, subject to the requirement that all such enterprises comply with certain workplace safety rules and standards designed to protect against the spread of COVID-19.

49. The Governmental Orders have required and continue to require SAS to cease and/or significantly reduce operations at, and have prohibited and continue to prohibit access to, its premises. As discussed below, both the presence of COVID-19 and the Governmental Orders caused a direct physical loss to property at the premises by denying use of the covered property, and by causing a necessary suspension of operations during a period of restoration. Additionally, COVID-19 and the Governmental Orders caused SAS loss of rental income (i.e., "Rental Value") from its tenants.

50. The Governmental Orders caused the suspension of SAS's operations. The suspension is ongoing, as some Governmental Orders have been extended and other Governmental Orders introduced.

51. Even where SAS and other businesses are permitted to continue certain operations, the Pandemic has had a significant impact on business volume and practices.

52. Despite the loosening of certain restrictions in Massachusetts, SAS's business has not returned to its prior, pre-loss capacity. Moreover, Massachusetts has recently reinstituted certain restrictions, causing additional suspensions of SAS's operations.

53. The Governmental Orders have caused the physical loss of SAS's insured property.

54. The Governmental Orders caused and are continuing to cause a Covered Cause of Loss, Business Income losses, and Extra Expenses.

**E.     SAS's Claim and General Star's "Investigation" and Denial**

55.     Faced with a loss that SAS sought to insure in purchasing the insurance in question, SAS made a claim under the Policy.

56.     On or about July 20, 2020 and August 25, 2020, SAS notified General Star of the loss, provided all details surrounding the loss, and permitted General Star with the opportunity to investigate and adjust the loss.  SAS further requested that General Star provide coverage and pay all benefits owed under the Policy for COVID-19 and the COVID-19 governmental suspension of business.

57.     General Star had an obligation to conduct a prompt and reasonable investigation.

58.     By letters dated July 22, 2020 and September 3, 2020, General Star failed and refused to affirm coverage despite having a reasonable time and opportunity to do so.

59.     In its September 3, 2020 letter, General Star, through counsel, "tentatively concluded" that SAS's claims are not covered under the Policy.

60.     General Star's "investigation" consisted of one of its property claims managers requesting that SAS provide additional information to effectively do General Star's due diligence.

61.     General Star did not visit, or ask to visit, SAS's premises.

62.     General Star did not investigate any of the property damage that SAS reported.

63.     General Star did not test SAS's property for the presence of COVID-19.

64.     General Star did not request that SAS test its property for the presence of COVID-19.

65.     General Star did not provide SAS with any other direction regarding testing its property for the presence of COVID-19.

66. Upon information and belief, the result of General Star's "investigation" was predetermined and General Star at all times intended to deny the claim.

67. General Star's investigation fell well short of its legal and contractual obligations.

**F.    The Policy Provides Coverage for SAS's Claim**

    **1.    SAS Has Suffered a "Direct Physical Loss of or Damage To" Property Under the Policy**

68. Based on its letters, General Star takes the position that SAS has not suffered a "physical loss or damage" as required by the Policy.  General Star takes the position that the Policy requires actual, tangible, permanent, physical alteration of property.  That is, General Star suggests that the requirement of a tangible physical loss applies to—and precludes—each type of coverage sought in this claim.  No so.

69. By the Policy's plain terms, SAS's inability to use its insured premises to operate its business due to COVID-19 is sufficient to trigger business income and related coverages.

70. The terms "physical loss of" and "physical damage to" are the key phrases in the Policy and they are worded in the disjunctive.  That is, the Policy expressly covers physical "loss of" *or* "damage to" property.  This necessarily means that either a "loss of" or "damage to" property is required, and again "loss" is distinct from "damage."  Thus, to the extent General Star focuses on an actual physical alteration this would ignore the coverage for a "physical loss of" property.   General Star could have defined "physical loss of" and "physical damage to," but it failed to do so.

71. SAS has submitted a covered claim for direct physical loss of or damage to property.  First, because the Policy does not define a direct "physical loss of" a Court interpreting the Policy would rely on the plain and ordinary meaning of the phrase.  The Merriam-Webster dictionary defines "direct" in part as "characterized by close logical, causal, or consequential

11

relationship." "Physical" is defined as "having material existence: perceptible especially through the senses and subject to the laws of nature." "Loss" is "the act of losing possession" and "deprivation."

72. Applying these definitions, in the least, SAS has adequately submitted a claim for a direct physical loss of property.

73. There is a causal relationship between both COVID-19 and/or the Governmental Orders and SAS's losses. COVID-19 is a physical substance that it lives on and is active on inert physical surfaces and is emitted into the air. COVID-19 remained in the air and attached to and deprived SAS of its property, making it unsafe and unusable, resulting in direct physical loss of or damage to the premises and property. Additionally, the Governmental Orders caused SAS direct physical loss of or damage to covered property because SAS has been unable to use its building and property for their intended purpose and SAS has suffered loss of business income, each of which are listed as covered property under the Policy. Accordingly, SAS has suffered a "direct physical loss of or damage to" property based on the plain and ordinary meaning of the phrase.

74. Here, the Policy provides coverage for "physical loss of or damage to" property. General Star conflates "loss of" and "damage to" to argue that the Policy requires a tangible, physical alteration. General Star—and any Court considering the issues—must give meaning to both terms.

75. SAS also has suffered "damage to" its property from COVID-19 under the relevant law.

76. For these reasons, SAS alleges economic harm, and that harm is tethered to its physical loss of or damage to property caused by COVID-19 and/or the Governmental Orders. As such, SAS submitted a claim for a direct physical loss or damage under the Policy.

**2.    SAS Has Submitted a Covered Claim for Civil Authority Coverage**

77. SAS has also submitted a covered claim for civil authority coverage. General Star contends that civil authority coverage requires direct physical loss to property other than SAS's property and that, just as COVID-19 and/or the Governmental Orders are not causing direct physical loss to SAS's premises, it/they are not causing direct physical loss to other property.

78. This argument fails for substantially the same reasons as discussed above. SAS has suffered a physical loss of or damage to property, and such "loss of or damage to" is applicable to other property. Additionally, as outlined above, civil authorities issued closure and stay at home orders throughout Massachusetts (i.e., the Governmental Orders), which includes property other than SAS's premises.

79. To the extent General Star argues that civil authority coverage requires that access to SAS's premises be prohibited by an order of Civil Authority, none of the aforementioned Governmental Orders prohibit access to SAS's premises. Rather, the Governmental Orders required SAS's business and all other businesses that provide personal services to suspend operations. Thus, because to these Governmental Orders, access was prohibited to such a degree as to trigger the civil authority coverage. This is particularly true insofar as the Policy requires that the "civil authority prohibits access," but does not specify "all access" or "any access" to the premises. For these reasons, SAS has submitted a covered claim for civil authority coverage.

### 3. SAS Has Submitted a Covered Claim for Sue and Labor Coverage

80. SAS has also submitted a covered claim for sue and labor coverage. This Policy provision imposes a duty on the insured to prevent further damage and to keep a record of expenses incurred in the event of a covered loss.

81. As General Star seemingly acknowledges in its September 3, 2020 letter, in the event of a covered loss, SAS can recover these expenses.

82. As discussed above, SAS has submitted a claim for a covered loss. Moreover, as a result of COVID-9 and in complying with the Governmental Orders and by suspending operations, SAS incurred expenses in connection with reasonable steps to protect Covered Property. Consequently, SAS has stated a claim for sue and labor coverage.

**G.    None of the Policy Exclusions Apply to Bar Coverage**

83. In its letters, General Star takes the position that it can rely on certain exclusions to deny coverage. For the following reasons, however, none of the exclusions apply here.

84. As a predicate matter, however, the Policy notably does not include any exclusion for losses caused by, for example, "virus," "pandemic," or "infectious disease," when exclusions including such language were available to General Star when it sold the Policy to SAS.

85. In fact, since 2006, an Insurance Services Office ("ISO") "virus" exclusion has been widely available for use by insurers. General Star made the decision not to include any such exclusion in its Policy. Under the law of most states, including Massachusetts, that decision prima facie prevents General Star from avoiding coverage for SAS's losses.

86. In any event, none of the other Policy Exclusions apply in this case.

87. First, General Star relies on the "Ordinance or Law" exclusion as a justification for its potential denial. On its face, the "Ordinance or Law" exclusion does not apply to SAS's

claim, which is predicated on the physical loss of property caused by COVID-19 and/or emergency governmental orders, not an ordinance or law.

88. Even if the "Ordinance or Law" exclusion could apply to SAS's claim, which it cannot, the exclusion would be in irreconcilable conflict with the specific grant of Civil Authority coverage and, thus ambiguous and subject to construction in favor of SAS.

89. Second, General Star relies on the "Governmental Action" exclusion, which excludes coverage for "[s]eizure or destruction of property by order of governmental authority. But none of the Governmental Orders ordered the "seizure" or "destruction" of SAS's property. Again, on its face, the "Governmental Action" exclusion does not apply to SAS's claim.

90. Third, General Star relies on the "Fungus, Wet Rot, Dry Rot and Bacteria" exclusion as a justification for its potential denial. Again, though, on its face the "Fungus, Wet Rot, Dry Rot and Bacteria" exclusion does not apply to SAS's claim. Clearly, neither the Coronavirus nor COVID-19 is a fungus, wet rot or dry rot.

91. Nor is Coronavirus or COVID-19 a bacteria. The coronavirus disease (COVID-19) is caused by a virus, not by bacteria.

92. Moreover, if General Star had intended the "Fungus, Wet Rot, Dry Rot and Bacteria" exclusion to include viruses, it had an obligation to expressly identify viruses among the specific agents being excluded.

93. Fourth, General Star relies on the exclusion for "[d]ischarge, dispersal, seepage, migration, release or escape of 'pollutants'". While the Causes of Loss – Special Form does not define the term "pollutants", the general Building and Personal Property Coverage Form does define that term. But, much like the "Fungus, Wet Rot, Dry Rot and Bacteria" exclusion

discussed above, the definition of "pollutants" in this definition does not include viruses. Again, this omission shows that General Star did not intend for the exclusion to encompass viruses.

94. And in any event, even assuming COVID-19 could be considered a "pollutant"—which it is not—this Policy exclusion contains a carve-out stating that "[i]f the discharge, dispersal, seepage, migration, release or escape of 'pollutants' results in a 'specified cause of loss', we will pay for the loss or damage caused by that "specified cause of loss". Thus, where—as here—COVID-19 resulted in a "specified cause of loss", this exclusion by its express terms does not act to bar coverage.

95. Finally, the Special Exclusion cited by General Star concerning the Business Income (and Extra Expense) Coverage Form in facially inapplicable because there has been no "[s]uspension, lapse or cancellation of any license, lease or contract." But even if there were, that exclusion has a carve-out where the "suspension, lapse or cancellation is directly caused by the 'suspension' of operations."

96. All conditions precedent to this action have been performed, have been waived, or are excused.

97. SAS is presently in genuine doubt and uncertain as to its rights, status, and privileges, under the Policy issued by General Star, and specifically, its rights, status, and privileges and General Star's obligations to provide coverage for the losses caused by COVID-19 and the COVID-19 governmental authority orders resulting in the suspension of SAS business operations for loss of business income, business interruption, extra expense, civil authority, all risk coverage, and all other coverage extensions up to the limits of the Policy per occurrence.

98. SAS has a bona fide, actual and present need for a declaration and construction of the Policy, its status, rights, and privileges, and General Star's obligation to provide coverage to

SAS under the Policy, including its primary coverage and all coverage extensions, including the applicable coverage triggers under the Policy.

99. A bona fide, actual, and present dispute exists as to SAS's rights and General Star's obligations under the Policy and this suit is not just a request for legal advice.

## COUNT I
### (Declaratory Judgment)

100. SAS repeats and realleges the foregoing paragraphs as if fully set forth herein.

101. SAS seeks the Court's declaration of the parties' rights and duties under the Policy pursuant to 28 U.S.C. § 2201.

102. A justiciable controversy exists between SAS and General Star about whether the Policy provides coverage for SAS's claim.

103. SAS has no adequate remedy at law.

104. Accordingly, SAS seeks a declaration from the Court that:

 a. The Policy covers SAS's claim; and

 b. No Policy exclusion applies to bar or limit coverage for SAS's claim.

## COUNT II
### (Breach of Contract)

105. SAS repeats and realleges the foregoing paragraphs as if fully set forth herein.

106. At all relevant times hereto, SAS and General Star were parties to an agreement, i.e., the Policy.

107. The Policy is a valid and enforceable contract between SAS and General Star.

108. In the Policy, General Star promised to pay for losses of business income incurred as a result of causes of loss not excluded.

109. Specifically, General Star promised to pay for losses of business income and extra expense sustained as a result of a suspension of business operations up to the policy limits.

110. COVID-19 and the COVID-19 Governmental Orders have caused and continue to cause direct physical loss of or damage to SAS's covered property, and resulting loss of business income and operating income, including payroll.

111. Because of the direct physical loss of or damage to property, SAS experienced a slowdown or cessation of their business (i.e., a "suspension," as defined by the Policy).

112. These suspensions and losses triggered the Policy's business income and extra expense coverages.

113. Additionally, in the Policy, General Star promised to pay for losses of business income and extra expense incurred as a result of certain actions taken by civil authorities that prohibit access to SAS's premises.

114. COVID-19 and the COVID-19 governmental authority orders caused direct physical loss of or damage to property other than SAS's property that prohibited access to SAS's premises.

115. SAS has experienced and continues to experience a loss under the Policy's civil authority coverage arising from the direct physical loss of or damage to property caused by COVID-19 and the COVID-19 governmental authority orders that prohibited access to SAS's premises.

116. These actions, losses, and expenses triggered civil authority coverage under the Policy.

117. Additionally, the sue and labor provision in the Policy imposes a duty on SAS to prevent further damage and to keep a record of expenses incurred in the event of a covered loss.

118. SAS is entitled to recover these expenses in the event of a covered loss.

119. As discussed, SAS has submitted a claim for a covered loss. As a result of COVID-19 and in complying with the Governmental Orders and by suspending operations, SAS incurred expenses in connection with reasonable steps to protect Covered Property. Consequently, SAS has stated a claim for sue and labor coverage.

120. SAS has complied with all applicable Policy provisions, including paying premiums and providing timely notice of their claims.

121. Nonetheless, General Star has unjustifiably failed and refused to affirm coverage and, though such inaction, statements and other conduct, has effectively denied coverage and refused to pay for these losses and expenses in breach the Policy.

122. SAS has suffered and continues to suffer damages as a result of General Star's breach of the Policy.

123. SAS is entitled to damages as a result of General Star's breach in an amount to be determined at trial, including pre- and post-judgment interest and any other costs and relief that this Court deems proper.

## RELIEF REQUESTED

WHEREFORE, SAS requests that this Court enter judgment in its favor and against General Star as follows:

A. As to Count I, a declaration that (1) the Policy covers SAS's claims up to the policy limits per occurrence; and (2) that no exclusion in the Policy applies to bar or limit coverage for SAS's claim;

B. As to Count II, that General Star breached to Policy by failing to pay SAS's claim and award SAS damages;

C. Award SAS prejudgment interest according to proof;

D. Award SAS its costs, expenses, attorneys' fees and expert witness fees; and

E.      Award such other and further relief, including equitable relief, as the Court deems just and appropriate.

## DEMAND FOR JURY TRIAL

SAS hereby demands a trial by jury on all issues so triable in this action.

Respectfully submitted,

Plaintiff,

SAS INTERNATIONAL, LTD.

By Its attorneys,

/s/ Eric E. Renner
Eric E. Renner  (BBO #666710)
Renner Law, LLC
50 South Main Street, Suite 202
Providence, RI  02903
Phone: 401-404-5251
Fax: 401-404-5285
erenner@rennerlawllc.com

Date:  November 12, 2020

## CERTIFICATE OF SERVICE

I hereby certify that on the 12th day of November, 2020, a true copy of the foregoing document was filed through the ECF system and will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF) and copies will be mailed to those indicated as non-registered participants.

/s/ Eric E. Renner